**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Gregory B. GILL, Defendant–Appellant.**

**No. 89–1372.**

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 20, 1990.

Decided Aug. 3, 1990.

---

Elsa C. Lamelas, Asst. U.S. Atty., Office of the U.S. Atty., Milwaukee, Wis., for plaintiff-appellee.

Allan A. Ackerman, Chicago, Ill. and Dennis P. Coffey, Coffey, Coffey & Ger-

aghty, Milwaukee, Wis., for defendant-appellant.

Before CUMMINGS, CUDAHY and MANION, Circuit Judges.

MANION, Circuit Judge.

Gregory Gill appeals his conviction in federal district court on two counts of wire fraud and one count of conspiracy. Gill challenges the sufficiency of the evidence as to two of the counts, the propriety of the trial judge's questioning of witnesses, and the trial judge's decision to change a jury instruction after closing arguments. We affirm.

### I.

In 1982, Gregory Gill and Michael Cohen started First Capital Corporation (FCC) in Newport Beach, California. FCC's purpose was to facilitate the formation and financing of new companies. Gill and Cohen (representing FCC) convinced Richard Damrow to raise $500,000 for the production of a music video, *Inner City Beat Man (ICBM)*. Damrow arranged for Gill to meet Jerry Heine, a representative of two Wisconsin investment firms.

Gill and Cohen prepared a three-page document entitled "First Capital Corporation Financial Statement," which claimed FCC had over $10 million in net assets. In fact, FCC had negligible worth. Gill and Cohen provided Heine with the financial statement and a guaranty by which FCC guaranteed repayment of Heine's investment plus interest if he would come up with $100,000. He did.

Damrow transferred, primarily by wire, $500,000 he had raised from various investors (including Heine) from a Wisconsin bank account to FCC's California account. However, *ICBM* was never produced. Heine and the other investors lost their money, with nothing to show for their investment but some apparently worthless stock in Spring Films.[1]

1. The parties dispute whether Spring Films stock has any value. The issue is not relevant to

On July 20, 1988, a federal grand jury returned a four-count indictment against Gill and Cohen, alleging various instances of mail and wire fraud. Cohen pleaded guilty to Count IV (wire fraud), pursuant to a plea agreement. Counts I through III were dismissed as to Cohen.

A jury convicted Gill on Counts I (conspiracy in violation of 18 U.S.C. § 371), III and IV (wire fraud in violation of 18 U.S.C. §§ 1343 and 2), and acquitted him on Count II (mail fraud in violation of 18 U.S.C. §§ 1341 and 2). Gill subsequently moved for judgment of acquittal, and, in the alternative for a new trial. The district court denied the motion. Gill was sentenced to five years imprisonment on Count I, two years imprisonment on Count III, and five years probation on Count IV. Gill was also ordered to pay $89,300 in restitution jointly and severally with Michael Cohen. Gill appeals, arguing (1) the evidence at trial was insufficient to sustain a conviction as to Counts I and IV, (2) the trial judge improperly interrupted and examined witnesses, and (3) the trial judge committed prejudicial error by refusing to give an approved jury instruction around which the defense had fashioned its argument.

### II. Sufficiency of the Evidence

#### A. *Count I*

At trial, Cohen denied during cross-examination that he intended to defraud the *ICBM* investors. Gill contends that since Cohen lacked fraudulent intent, he was legally incapable of being a conspirator. Since the crime of conspiracy requires a meeting of the minds, Gill argues there was insufficient evidence to sustain a guilty verdict as to the conspiracy count.

The government contends Gill waived this argument by not raising it at the trial level. In the district court, Gill's counsel simply argued that Cohen denied he and Gill agreed to a scheme to defraud—since there was no agreement, there was no conspiracy. Gill's counsel

this appeal.

never argued that Cohen's alleged lack of intent to defraud meant Gill could not be party to a conspiracy. Therefore, that argument cannot be considered by this court absent plain error. *United States v. Hudson,* 884 F.2d 1016, 1023 (7th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 3221, 110 L.Ed.2d 668 (1990); *United States v. Fuesting,* 845 F.2d 664, 670 (7th Cir.1988). Plain error requires " 'a miscarriage of justice,' which 'implies the conviction of one who but for the error would have been acquitted.' " *United States v. Field,* 875 F.2d 130, 135 (7th Cir.1989) (quoting *United States v. Smith,* 869 F.2d 348, 356 (7th Cir.1989) (other citations omitted)). We find no plain error in this case. The argument is waived.

■ Even if the argument has not been waived, it has no merit. Cohen's testimony was inconsistent on the issue of intent. He flatly denied intent to conspire and defraud, but thoroughly described events that were overwhelmingly probative of criminal intent. These events included preparation of the phony financial statement and guaranty. When Heine asked for FCC's financial statement, Gill and Cohen together revised a false financial statement and produced a new document. The financial statement they sent to Heine claimed that FCC had net assets of over $10 million, including cash reserves of $500,000. At the time, FCC not only lacked assets and income, but could not even meet its payroll. The day Heine received the FCC financial statement, FCC had a balance of $1,317.50 in its bank account. That day, after embellishing the financial statement further during a telephone conversation with Heine, Gill told Cohen that Heine wanted a corporate guaranty. When Cohen questioned the guaranty, Gill told him it didn't matter because it was all "blue sky." Cohen prepared the guaranty and both men signed it. After obtaining Heine's and the other investors' money, Gill and Cohen together spent it. But, despite prior repre-

sentations to the contrary, they did not spend the money on *ICBM.*

The district judge, having heard this and other evidence, denied Gill's motion for judgment of acquittal. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), sets forth the standard of review for a trial court's denial of judgment of acquittal:

> [T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.... *[A]ll of the evidence* is to be considered in the light most favorable to the prosecution.

*Id.* at 319, 99 S.Ct. at 2789 (citations omitted). We find that a rational trier of fact could conclude that both Cohen and Gill had fraudulent intent and were conspirators.

### B. Count IV

■ Gill also argues there was insufficient evidence to convict him of the August 1, 1983, wire transfer of $165,000 from Damrow's account in Wisconsin to FCC's Huntington National Bank account in California (Count IV). Gill claims that because he was not directly involved in the decision to transfer the money by wire, he could not have caused the transfer. The issue is whether any rational trier of fact could have concluded that Gill caused the wire transfer as charged.

In *United States v. Bonansinga,* 773 F.2d 166 (7th Cir.1985), *cert. denied,* 476 U.S. 1160, 106 S.Ct. 2281, 90 L.Ed.2d 723 (1986), this court upheld mail fraud convictions [2] based upon the mailings of invoices and checks in which defendant Bonansinga was uninvolved, and which were between innocent parties. Bonansinga's accomplices took automotive supplies intended for Bonansinga's employer and delivered them to Bonansinga, who converted the supplies to his own use. The charged mailings were based on bills for the supplies

---

**2.** "[C]ases construing the mail fraud statute [18 U.S.C. § 1341] are [also] applicable to the wire fraud statute [18 U.S.C. § 1343]." *U.S. v. Gimbel,* 830 F.2d 621, 627 (7th Cir.1987) (quoting

*U.S. v. Feldman,* 711 F.2d 758, 763 n. 1 (7th Cir.), *cert. denied,* 464 U.S. 939, 104 S.Ct. 352, 78 L.Ed.2d 317 (1983)).

and payment checks between Bonansinga's employer and the supplier of automotive goods. Though Bonansinga was not directly involved in the mailings, the court held he nevertheless caused them. "Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or when such use can be reasonably foreseen, even though not actually intended, then he 'causes' the mails to be used." *Id.* at 168 (quoting *Pereira v. United States*, 347 U.S. 1, 8–9, 74 S.Ct. 358, 363, 98 L.Ed. 435 (1954)).

There is reason to believe that Gill knew of the wire transfers. Damrow had transferred funds by wire: $50,000 on June 20; $15,000 on July 7; $50,000 on July 14; and $65,000 on July 26. Cohen testified that he and Gill daily spoke with Damrow and that he daily discussed FCC's financial trouble with Gill. Cohen had discussed the wire transfer of Heine's investment with Gill, and believed Gill made the initial arrangements with Damrow to wire-transfer other funds. We find a rational trier of fact could reasonably conclude that Gill could foresee the August 1, 1983 wire transfer.

### III. The District Court Judge's Questioning of Witnesses

■ Gill challenges the trial judge's questioning of government witnesses. Rule 614(b) of the Federal Rules of Evidence provides: "The court may interrogate witnesses, whether called by itself or by a party." In *United States v. Kwiat*, 817 F.2d 440 (7th Cir.), *cert. denied*, 484 U.S. 924, 108 S.Ct. 284, 98 L.Ed.2d 245 (1987), where the trial court asked 60 questions during an eight-day trial, this court noted: "The judge took an active role in this trial, which we do not seek to discourage. Passive presiding may contribute to long, unmanageable trials." *Id.* at 448. The critical inquiry is whether by its conduct the court conveyed to the jury a bias or belief regarding the defendant's guilt. *United States v. Baron*, 602 F.2d 1248, 1249 (7th Cir.), *cert. denied*, 444 U.S. 967, 100 S.Ct. 456, 62 L.Ed.2d 380 (1979).

■ During the government's direct examination of Cohen, the trial court intervened, questioning Cohen about FCC, its size, its number of employees, and the routing of money obtained from Wisconsin investors. Alluding to the FCC's questionable accounting practices which Cohen recounted in answer to the court's questions, the court remarked:

> *Court:* If a lawyer did that, he would be in big trouble, wouldn't [he]?
>
> *Cohen:* Yes, he would.
>
> \*　\*　\*　\*　\*　\*
>
> *Court:* But isn't it almost inconceivable that you've got two fellahs who had been in this business and you're a practicing lawyer and you get half a million dollars wired to you and you don't even segregate it?
>
> *Cohen:* Your Honor, you know, I—you know, I've plead [sic] guilty to a crime, and I have complete shame and, you know, I'm so embarrassed and humiliated by this whole thing, it's hard for me to even explain it to you.

The examination continued, probing into the disposition of the invested monies. Defense counsel Coffey moved for a mistrial:

> *Coffey:* Your Honor, on behalf of my client, ... I'm asking the Court for a mistrial as a consequence of Mr. Cohen's remarks to the Court about his status and his embarrassment and his sorrow and his contrition.... We now have a gentleman who has cut his deal with the government, comes in and tells the jury how sorry he is about all of this has happened, and I would submit, Judge, that that creates an improper inference with respect to my client in the eyes of the jury in that here we have a witness who says I did it ... but Mr. Gill is here being tried and hasn't admitted his guilt, and I think that creates an improper and prejudicial inference with respect to my client, so I would move for a mistrial.

The court denied the motion.

Richard Damrow was another prosecution witness. The court interrupted Damrow's cross-examination:

*Court:* How could he [Gill] do that, if he had already given away his stock?

\* \* \* \* \* \*

*Court:* When you went out and raised the first half million dollars that you raised?

*Damrow:* Yes.

*Court:* Did you utilize any financial statements of First Capital Corporation?

*Damrow:* I personally did not. If we say, for the four hundred thousand dollars that I was involved with, other than Dean and Co. the answer would be there was no other financial statements provided of any sort. To that four hundred thousand, the only financial statement that was provided to my understanding is the one that was provided to Dean and Co. prior to their involvement.

*Court:* Did you converse with Mr. Gill about that financial statement?

*Damrow:* Not to its details. When I had talked with various people, being Jerry Heine and Carl Backus, I was under the impression,—

*Coffey:* I am going to object to that as hearsay.

*Court:* Well, answer my question first. Did you ever talk to Mr. Gill himself about it?

*Damrow:* Not in detail but in general we did.

*Court:* Did you ever ask him why they had a financial statement that looked like the exhibit that's off to your left?

*Damrow:* I was told by Mr. Gill that he operated a successful investment banking firm, he was taking companies public and that the things that were listed on the balance sheets were properties that he owned or that company owned.

In support of his challenge to the trial court's questioning of Damrow and Cohen, Gill principally relies on *United States v. Tobin,* 426 F.2d 1279 (7th Cir.1970). The trial court in *Tobin* intensely cross-examined the defendant regarding motive, the single contested fact. The Seventh Circuit found that:

> In these circumstances, we are compelled to conclude that the defendant was denied a fair trial when the trial court subjected him to an intense cross-examination which might easily have given the jury the impression that the court had doubts concerning the truthfulness of his testimony on this critical issue.

*Id.* at 1283.

Conversely, in this case the trial court's allegedly improper questions were quite limited and aimed solely at prosecution witnesses, rather than at the defendant as in *Tobin.* Neither the questions themselves nor the limited nature of the trial judge's intervention implied a bias against Gill. Furthermore, the trial judge in this case instructed the jury both at the beginning and at the end of trial that no personal opinion should be inferred from the court's questions and that the jury, not the judge, was the ultimate trier of fact. We find that none of the trial court's questions reasonably could have impugned the impartiality of the trial judge in the eyes of the jury. The trial court's questioning in no way prejudiced Gill's rights and therefore was not improper.[3]

## IV. Closing Arguments and the Jury Instruction

 The trial court issued jury instructions to the parties to which the government failed to object until Gill's counsel had begun his closing argument. The court amended the instructions to conform to the government's objection. Gill contends this is reversible error.

Rule 30 of the Federal Rules of Criminal Procedure requires that written jury instruction requests be filed by the parties by the close of evidence. Technical infractions of Rule 30 require reversal only where the defendant can show actual preju-

---

**3.** But see *Tobin, supra,* where this court observed that a trial judge "would ordinarily do well to forego ... intrusions upon the function of counsel, thus maintaining the court's position of impartiality in the eyes of the ever-observant jurors." 426 F.2d at 1282 (quoting *United States v. Carmel,* 267 F.2d 345, 350 (7th Cir.1959)).

dice. *United States v. Baker*, 722 F.2d 343, 346 (7th Cir.1983), *cert. denied*, 465 U.S. 1037, 104 S.Ct. 1312, 79 L.Ed.2d 709 (1984). The government submitted an instruction on the first element of wire and mail fraud requiring a finding that Gill "[k]nowingly advised a scheme to defraud ... *or* obtained money or property by means of false pretenses, representations or promises as described in the indictment...." (emphasis added). Gill submitted an instruction as to the first element requiring a finding "that the defendant knowingly obtained money or property by means of false pretenses, representations, or promises as charged in the indictment." However, after an instruction conference, the parties agreed to an instruction which conformed with neither of those submitted (but did conform with the indictment) by requiring "[t]hat the defendant knowingly devised a scheme to defraud *and* to obtain money or property by means of false pretenses, representations, or promises...." (emphasis added).

The trial judge recounted what occurred during the instruction conference in his January 9, 1989 order denying Gill post-conviction relief:

> The original jury instruction used the language charged in the indictment.... Although there were no objections to the instruction at the jury instruction conference, the government objected to the instruction the following day.... Neither of the proposals required the government to prove a scheme to defraud and to obtain money. The original draft of the court's instructions erroneously inserted that requirement. When this came to the court's attention [during closing arguments], the instruction was amended to follow federal law.

Gill now contends that he was unfairly prejudiced because, relying on a belief that the trial court would charge in the conjunctive (that the prosecution must prove a scheme to defraud *and* to obtain money, rather than a scheme to defraud *or* to obtain money), his counsel so argued to the jury. However, Gill's counsel did not rely on the mistaken instruction; his argument to the jury during opening and closing was

that Gill lacked the intent to defraud, and that Cohen and Heine lacked credibility.

During closing arguments, Gill's counsel touched upon the conjunctive/disjunctive issue, but only to the extent of pointing out the language of the indictment:

> We spent forty minutes this morning listening to Ms. Lamelas (the prosecutor) go through the exhibits, the financials, and I understand that's the government's theory on why there were false statements made, but, ladies and gentlemen, look at the indictment when you are in your deliberations because the indictment doesn't say, at least in my view, what Ms. Lamelas is telling you it says. She says you have to make the false pretenses and it's got to be scheme or artifices, and she puts an "or" in there, at least the way I interpret her remarks. In their indictment it's "and." You have got scheme and artifice. It has to be the intent to defraud, and you have to make the false statements. I hold the government to that, ladies and gentlemen, because that's the law.

At that point the prosecutor objected: "Judge, I think he is misstating the law. I doubt very much the government has to prove in the disjunctive of 'or,' or prove in the conjunctive of 'and.' Now, Mr. Coffey knows that." The court ordered a side bar, after which the defense counsel continued his closing argument without further reference to the conjunctive/disjunctive distinction.

Following closing arguments, the trial court conducted a hearing on whether the jury should be charged in the conjunctive or disjunctive. The court decided to instruct in the disjunctive. However, when charging the jury the court stressed that Gill's counsel had correctly stated that the indictment charged in the conjunctive:

> You may have been aware this morning that there was a controversy between counsel and we had a side bar conference as to whether it was, what had been said by defense counsel and what the contention was of the government as to what had to be proved in

order to meet the first element of this charge. I have read the Indictment to you exactly as it appears in the indictment, and the indictment used the word, quote, and, unquote: "that the defendant knowingly devised a scheme to defraud and to obtain money or property by means and false pretenses, representations, and promises as described in the indictment," and in his closing argument defense counsel urged that you read the indictment and consider that in your deliberations, and he was absolutely correct in saying that it read quote, and, unquote.[4]

In *United States v. Baker, supra,* the government's indictment charged that defendant had embezzled, abstracted, or purloined funds. Without objection, the trial court agreed to give the government's jury instruction, which only charged that Baker had embezzled funds (mistakenly leaving out the terms "abstract" and "purloin"). During closing argument, defense counsel argued that defendant had not embezzled the checks, but instead had stolen them. Over defense counsel's objection, the trial court subsequently added the words "abstract" and "purloin" to the jury instruction, and the defendant was convicted. In affirming the conviction, the Seventh Circuit determined that Baker's counsel had not relied on the incorrect instruction during closing argument. Baker's counsel had stated that his client "was a thief and not an embezzler, [but] he never actually argued that the defendant should be acquitted on this technical ground." *Id.* at 346.

Similarly, Gill's counsel did not rely on the original mistaken instruction. He referred to the use of the word "and" in the indictment (which was a correct characterization of the indictment). But he never referred to the original instruction's use of the conjunctive. He never contended Gill should be acquitted because he only intended to defraud *or* obtain money by false pretenses but did not intend to do both. Because Gill did not detrimentally rely on

the initial instruction, the trial court's decision to change that instruction did not prejudice him.

For these reasons, the judgment below is AFFIRMED.

---

**4.** Gill does not contend on appeal that the jury instruction actually delivered by the court in any way misstated the law. Neither does he contend jury instructions must always conform to the language of the indictment. He only contends the court may not amend an agreed-upon instruction after counsel has relied upon that instruction in his closing argument.