**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Herbert Marvin FEINBERG,**
**Defendant–Appellant.**

No. 94–3928.

United States Court of Appeals,
Seventh Circuit.

Argued March 26, 1996.

Decided July 8, 1996.

Rehearing and Suggestion for Rehearing
En Banc Denied Sept. 19, 1996.

Barry Rand Elden, Chief of Appeals, James Wright (argued), Office of the United States Attorney, Criminal Appellate Division, Chicago, IL, for Plaintiff–Appellee.

James A. McGurk (argued), McConnell & Mendelson, Chicago, IL, for Defendant–Appellant.

Before ESCHBACH, MANION, and ROVNER, Circuit Judges.

ESCHBACH, Circuit Judge.

Herbert Marvin Feinberg was convicted of conspiracy to commit extortion, attempted extortion, using interstate commerce to facilitate extortion, causing others to use or carry a destructive device to commit extortion, and causing others to affect interstate commerce by attempting to destroy property. The district court sentenced Feinberg to 481 months' imprisonment. Feinberg appeals several aspects of both his convictions and his sentence. We AFFIRM.

## I.

Today we consider the same set of facts that we have considered twice before in *United States v. Sturman,* 49 F.3d 1275, 1277–79 (7th Cir.1995), and *United States v. Martinez,* 16 F.3d 202, 204–05 (7th Cir.), *cert. denied, Mahn v. United States,* —— U.S. ——, 114 S.Ct. 2150, 128 L.Ed.2d 877 (1994). In this case, we consider the facts with regard to Herbert Feinberg. However, we assume familiarity with *Sturman* and *Mar-*

*tinez*. In what follows we provide only a summary of the facts relevant to this appeal.

Feinberg's troubles started when his associate, Reuben Sturman, asked Feinberg for a favor. Sturman was a key "player" in the porn industry in the 1980's. Sturman was not the kind of "player" that stars in adult videos; Sturman was a supplier. He furnished the requisite smut to countless porn retailers across the country. Sturman became so powerful that he was able to demand (or extort) large sums from the retailers that he serviced. When retailers in Phoenix, Cleveland, and Chicago stopped paying, Sturman decided to "send them a message." Rather than turning to Western Union, he turned to Feinberg.

Feinberg contacted Kevin Beechum to solicit assistance in vandalizing the first retailer, located in Phoenix. Through Beechum, Feinberg hired Jay Brissette. In December of 1991, Brissette and two associates, Donald Mares and Paul Mahn, vandalized the Phoenix store. The trio used baseball bats and hammers to smash the store's video machines. The retailer acquiesced; the retailer's payments to Sturman resumed. Pleased with the result, Feinberg returned to Brissette in March of 1992 and asked Brissette to vandalize eight retail stores owned by Roy and Paula May in Chicago. Feinberg and Brissette agreed on a price of $7,500 for each of the eight jobs. Feinberg instructed Brissette to carry out the vandalizations in a fashion similar to the one in Phoenix. However, the two discussed alternative options, such as the use of bombs. Feinberg recounted to Brissette a story regarding the effectiveness of stink bombs, noting that it took weeks for the victims to get the smell out. Feinberg left the decision whether to use bombs to Brissette.

Brissette returned to Mares and Mahn to help him with the Chicago vandalizations. He also hired a third man: Joseph Martinez. After visiting each of the targeted bombing sites and conferring with his associates, Brissette decided to use bombs. To add pyrotechnic variety, Brissette developed two types of bombs: metal pipe bombs and plastic pipe bombs containing "stink vials." Brissette and his associates designed the highly explosive bombs to be triggered by remote control. Brissette planned to plant bombs at six of the Mays' Chicago stores. Brissette and Martinez were to place one of the bombs, leaving Mahn and Mares to place the remaining five. On April 15, 1992, Mares and Mahn successfully planted one bomb. While in route to plant a second bomb, Mares removed a bomb from his bag and placed it on his lap. Something triggered the bomb. The bomb exploded in the car at the intersection of Dearborn and Division streets in Chicago. The car burst into flames. Both Mares and Mahn successfully escaped from the burning car. Mahn fled the scene and rendezvoused with Brissette and Martinez. Mares was not so lucky. He died from his injuries that resulted from the explosion.

Brissette traveled to California to inform Feinberg of the debacle. Feinberg vowed to provide for Brissette's defense, but admonished Brissette to keep his mouth shut. Wisely Brissette turned a deaf ear to Feinberg and began cooperating with the federal government. Federal indictments followed the government's investigation. On March 11, 1993, Feinberg and Sturman were charged in a ten count federal indictment. Feinberg was included in the following charges: Count One charged Feinberg and Sturman with conspiracy to extort money from retailers in Phoenix, Cleveland, and Chicago in violation of 18 U.S.C. § 1951; Count Seven charged Feinberg and Sturman with the attempted extortion of Roy May in violation of 18 U.S.C. § 1951; Count Eight charged Feinberg and Sturman with the use of interstate commerce to facilitate extortion in violation of 18 U.S.C. § 1952; Count Nine charged Feinberg and Sturman with causing others to use or carry a destructive device in the commission of extortion in violation of 18 U.S.C. § 924(c)(1); and, Count Ten charged that Feinberg and Sturman caused others to affect interstate commerce by attempting the destruction of property with an explosive in violation of 18 U.S.C. § 844(i), and that one of the alleged coconspirators—Mares—died from the incident. Sturman and Feinberg were tried separately.

On April 1, 1994, the jury convicted Feinberg on all counts. The court sentenced

Feinberg to the mandatory minimum of 30 years for his conviction on Count 9, and 121 months for the remaining counts, to be served consecutively (for a total sentence of 481 months). Feinberg now appeals both his conviction and his sentence. We have jurisdiction pursuant to 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291.

## II.

Feinberg begins the assault upon his convictions by arguing that the district court's practice of permitting witness questioning by members of the jury unfairly prejudiced him at trial. The Honorable Warren K. Urbom of the United States District Court for the District of Nebraska presided as visiting judge over Feinberg's trial. In his preliminary instructions to the jury, Judge Urbom said:

> Most of the testimony will be given in response to questions by the attorneys.... When the attorneys have finished their questioning of a witness ... I shall ask you whether you have any questions of that witness. If you do, address each of your questions to me, and if I decide that it meets the legal rules, I shall ask it of the witness. After all of your questions of a witness have been dealt with, the attorneys will have an opportunity to ask the witness further about the subjects raised by your questions. When you direct questions to me to be asked of the witness, you may state them either orally or in writing.

Following each witness's testimony, Judge Urbom turned to the jury and inquired whether they had any questions for the witness. On ten occasions jurors proffered questions. Feinberg objected to neither the jury's ability to ask questions nor to any of the jurors' proffered questions. The majority of the jurors' questions sought clarification of testimony.[1] In most instances, the jurors posed their questions verbally to Judge Urbom. Judge Urbom, in directing the questions to the witnesses, rephrased the questions in accord with the Federal Rules of Evidence. However, on at least two occasions the witnesses began responding to the

jurors' questions before Judge Urbom could intervene.

■ Feinberg failed to object to any of the jurors' questions. Therefore, we review for plain error. *United States v. Olano*, 507 U.S. 725, 732–36, 113 S.Ct. 1770, 1777–78, 123 L.Ed.2d 508 (1993). In the context of reviewing the propriety of a juror's question where the defendant failed to make a contemporaneous objection, the defendant must show prejudice to prevail on appeal. *United States v. Bush*, 47 F.3d 511, 514 (2nd Cir. 1995). In other words, to establish plain error Feinberg must show that but for the jurors' questions, the outcome of the trial probably would have been different. *Olano*, 507 U.S. at 735, 113 S.Ct. at 1778.

Feinberg contends that permitting jurors to ask questions is prejudicial per se. The permissibility of witness questioning by jurors is a matter of first impression in this circuit. Every circuit to consider the practice has found it permissible in some circumstances. *See Bush*, 47 F.3d at 515; *United States v. Stierwalt*, 16 F.3d 282, 286 (8th Cir.1994); *United States v. Cassiere*, 4 F.3d 1006, 1017–18 (1st Cir.1993); *United States v. Polowichak*, 783 F.2d 410, 413 (4th Cir. 1986); *United States v. Callahan*, 588 F.2d 1078, 1086 (5th Cir.), *cert. denied*, 444 U.S. 826, 100 S.Ct. 49, 62 L.Ed.2d 33 (1979); *United States v. Gonzales*, 424 F.2d 1055, 1056 (9th Cir.1970) (per curiam). However, those same courts have expressed grave concerns about the practice. We agree that the practice is acceptable in some cases, but do not condone it. We share the reservations expressed by other courts.

Although questioning by jurors is "deeply entrenched" in American jurisprudence, *Bush*, 47 F.3d at 515, concern over the practice is warranted. Witness questioning by jurors is fraught with risks. If permitted to go too far, examination by jurors may convert the jurors to advocates, compromising their neutrality. *Id.* Jurors also may begin premature deliberation. *Id.* Further, the practice "will often impale attorneys on the horns of a dilemma." *Id.* Attorneys are faced with objecting to questions proffered

---

1. No jurors questioned Feinberg.

by the arbiters that the attorneys are attempting to influence. The risk that an objection will alienate a jury is rather obvious. In cases such as this one, where jurors are permitted to blurt out their questions, the district court almost invites a mistrial. The district court leaves open the possibility that a juror will ask an impermissibly prejudicial question to which the witness responds before the judge is able to intervene. In the event of such a mishap, the entire trial may be rendered nothing more than a lesson in futility.

█ Whether to permit jurors to ask questions is a decision best left to the discretion of the district judge. *United States v. Witt*, 215 F.2d 580, 584 (2nd Cir.), *cert. denied, Talanker v. United States*, 348 U.S. 887, 75 S.Ct. 207, 99 L.Ed. 697 (1954). However, implicit in his exercise of discretion is an obligation to weigh the potential benefit to the jurors against the potential harm to the parties, especially when one of those parties is a criminal defendant. There may be cases, such as conspiracy or antitrust cases, in which the facts are so complicated that jurors should be allowed to ask questions in order to perform their duties as fact-finders. Of course those cases are the exceptions, not the rule. In the vast majority of cases the risks outweigh the benefits.

A district court can take prophylactic measures in an attempt to prevent the practice from harming either party. *Cf. Bush*, 47 F.3d at 516 (outlining procedures for courts to follow to insure against prejudice). For example, common sense dictates that the questions should be proffered in writing to the district court judge. By reducing the questions to writing, a court eliminates the possibility that a witness will answer a question prematurely. Written questions also guard against juror commentary that suggests or precipitates premature deliberation.

The district court below failed to take prophylactic measures. The court left itself vulnerable to attacks such as Feinberg's second argument: that the specific questions and comments made by the jurors were prejudicial. Thus, we must examine the content of the jurors' questions.

As noted above, the majority of the jurors' questions were nothing more than attempts to seek clarification of testimony. In our view, all of the questions were innocuous. At oral argument, when pressed by the court for an example of a prejudicial question, Feinberg's counsel directed the court to a portion of the trial transcript in which jurors questioned Marvin Gavin, a detective with the Chicago Police Department, about the method used to disarm pipe bombs and the explosive impact of a pipe bomb. Because these questions appear to be the focus of Feinberg's prejudice argument, we will limit our discussion to those questions.

The relevant portion of the trial transcript sets forth the following discussion between the jurors, Gavin, and the court:

A JUROR: A little clarification on that shot. Does that mean it actually looks like a shotgun and you stand back at a distance and actually shoot the controls off the pipe bomb?

[GAVIN]: Yes. It's what we call a remote procedure. We are back—I was back maybe 150, 200 feet both times I rendered these devices safe. We place the render-safe tool up against the pipe, okay? And we propel the—electrically shoot the shot, which propels the Avon round down the tube and knocks off the end cap of the pipe.

A JUROR: All right.

THE COURT: Yes?

A JUROR: Another question I have. Early on in a statement he made when he arrived on the scene, he saw that—the roof was distended, and I can't remember if he said the door was blown open. The reason I ask that is that I thought in the first witness who is not here, who was ill and we heard her written testimony, I thought she said that both the driver and the passengers crawled out of the windows when they were on fire. I can't remember if that was-

THE COURT: You want to know whether the doors were open?

A JUROR: He says the doors were blown open. I thought that's what he did say.

THE COURT: That's what you're asking?

A JUROR: And that would conflict with the first witness.

THE COURT: I can't ask him to explain her testimony. I can ask him what he knows.

A JUROR: Right.

THE COURT: You want to know whether the doors were actually opened?

A JUROR: By the explosion.

THE COURT: What did you find with respect to the doors?

[GAVIN]: By the time I got there, it was my impression the doors were blown open, but I am not certain if it was the Fire Department maneuver, if they opened it to fight the fire or if the explosion—I thought the explosion bent it and pushed it out, and the Fire Department maybe pried it open a little to fight the fire.

A JUROR: Okay. Thank you.

At oral argument Feinberg's counsel maintained that the questions evince premature deliberation by the jury.

■■■ We disagree. In fact, we see no evidence of deliberation whatsoever. The questions merely demonstrate that the jurors either wanted Gavin to elaborate on a point, or that there was a potential inconsistency between Gavin's testimony and the testimony of another witness. The jurors gave no indication as to their opinion regarding either the credibility of the witnesses or their belief as to Feinberg's guilt or innocence. Further, to the extent that the jurors' comments evince deliberation, it is deliberation among jurors, not between jurors and other persons not on the jury. "[W]hen there are premature deliberations among jurors with no allegations of external influence on the jury, the proper process for jury deliberation has been violated, but there is no reason to doubt that the jury based its ultimate decision only on

the evidence formally presented at trial." *United States v. Resko*, 3 F.3d 684, 690 (3rd Cir.1993). In other words, there is no basis to believe that absent the jurors' questions the jury would have reached a different conclusion regarding Feinberg's guilt. Therefore, Feinberg has demonstrated no evidence of prejudice.[2] His attempt to overturn his conviction based on the jurors' questions necessarily fails.

## III.

Next Feinberg attacks his conviction on Count 9, arguing that Count 9 was constructively amended, and that the district court's jury instructions violate *Bailey v. United States*, —— U.S. ——, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995). We address each of Feinberg's arguments in turn.

### A. The constructive amendment.

Count 9 of the indictment charged that Feinberg and Sturman caused Brissette and his associates "to use and carry a destructive device, namely, pipe bombs, during and in relation to the commission of a crime of violence, that is, the extortion of Roy May . . . as more fully set forth in Count 7. . . ." Feinberg argues that the act of extortion was never completed in that neither he nor Sturman ever received any funds from the Mays as a result of the Chicago bombings. Therefore, Feinberg argues that at best the proof at trial was that Feinberg is guilty of causing another to use or carry a firearm during the commission of *attempted extortion*. Given that he was convicted of causing another to use or carry a firearm during the commission of *extortion*, Feinberg contends that the evidence at trial impermissibly amended the indictment.

■■■ Feinberg's argument fails for a host of reasons. First, Count 9 refers to "the

2. Feinberg also argues that prejudice is demonstrated by the fact that a different jury, considering substantially similar evidence, acquitted Sturman on some of the counts of which both Feinberg and Sturman were charged. The mere fact that a different jury hearing the case of a co-conspirator reached a result different from the jury hearing a defendant's case cannot, in and of itself, prove that the defendant was prejudiced by conduct during his trial. As a preliminary mat-

ter we note that Sturman's jury did find Sturman guilty of several offenses. More important, an inherent component of the jury system is that different juries may reach different results. Jurors may take differing views of the evidence, especially with regard to witness credibility. There is nothing to suggest that Feinberg's jury, considering the evidence introduced at his trial, would have reached a different result.

extortion ... as more fully set forth in Count 7." Count 7 charged that Feinberg and Sturman "knowingly attempted to commit extortion" against the Mays. The language in Count 9 referring to "extortion," in conjunction with the reference to Count 7, clearly means that Feinberg was charged with using and carrying pipe bombs during the attempted extortion of the Mays. However, even if we were to accord Count 9 the interpretation urged by Feinberg, Feinberg's argument is unavailing. We have held that "certain lesser included offenses, such as attempt ... need not appear in the indictment," *United States v. Neapolitan*, 791 F.2d 489, 500 n. 6 (7th Cir.), *cert. denied, Messino v. United States*, 479 U.S. 939, 107 S.Ct. 421, 93 L.Ed.2d 371 (1986), absent proof that "any departure from the strict terms of the indictment either surprised the defendant or prejudiced his or her defense...." *United States v. Leichtnam*, 948 F.2d 370, 377 (7th Cir.1991). There is no evidence that reading the indictment to include attempted extortion either surprised Feinberg or prejudiced his defense.

▪ Any reservations we may have about Feinberg's constructive-amendment argument are resolved by the standard of review. Feinberg failed to object to the alleged constructive amendment below. Therefore, we review for plain error. *Olano*, 507 U.S. at 732–36, 113 S.Ct. at 1777–78. For us to reverse in the context of reviewing a constructive amendment for plain error, "the amendment must constitute 'a mistake so serious that but for it the [defendant] probably would have been acquitted.'" *United States v. Remsza*, 77 F.3d 1039, 1044 (7th Cir.1996) (quoting *United States v. Gunning*, 984 F.2d 1476, 1482 (7th Cir.1993)). Absolutely nothing suggests that the jury would have reached a different result had Count 9 expressly referenced "attempt." [3]

**B. The impact of Bailey v. United States.**

Next Feinberg contends that his conviction under Count 9 should be reversed pursuant to the Supreme Court's ruling in *Bailey v. United States*. The cornerstone of Feinberg's argument lies in the district court's instruction to the jury regarding the meaning of "use and carry" in 18 U.S.C. § 924(c)(1). The district court instructed the jury in relevant part as follows:

To sustain the charge of using or carrying a destructive device during and in relation to an extortion as set forth in Count 9 of the indictment, the government must prove the following propositions: First, the defendant is guilty of the offense charged in Count 7 of the indictment. Second, the defendant used or carried a destructive device during and in relation to the offense charged in Count 7. The phrase "used and carried a destructive device" means that the destructive device facilitated or had a role in the commission of the offense charged in Count 7 of the indictment.

\* \* \* \* \* \*

In addition to the instructions I have already given you concerning Counts 7, 8, 9, and 10, there is a second way that the government can prove the defendant guilty of these crimes. I instruct you that if you find the defendant guilty of the conspiracy charged in Count 1 and if you find beyond a reasonable doubt that while he was a member of the conspiracy, one of his fellow conspirators committed the offense charged in Count 7 in furtherance ... of that conspiracy, then you should find him guilty of Count 7. The same treatment may be given with respect to Counts 8, 9 and 10 separately.

*Bailey*, which narrowed the definition of "use," was decided after Feinberg's trial but before he filed his appellate brief with our court. Feinberg failed to object to the jury instruction below. Therefore, we review for

---

**3.** In his reply brief, Feinberg introduces a host of additional arguments including: that attempted extortion is not a "crime of violence" as that term is defined in 18 U.S.C. § 924(c)(1); and, that the indictment failed to allege "intent." Apart from the fact that the objections are meritless, they were raised for the first time in the reply brief. As we will discuss later, it is wholly inappropriate for an appellant to raise new issues or novel theories in his reply brief. Therefore, we will not discuss the merits of Feinberg's arguments on these points. The arguments are not before the court.

plain error.[4] *United States v. Baker*, 78 F.3d 1241, 1246–47 (7th Cir.1996); *see also, United States v. Ramirez–Ferrer*, 82 F.3d 1149, 1151 (1st Cir. 1996) (applying a plain error standard of review); *cf. United States v. Hoskins*, 406 F.2d 72, 74 (7th Cir.1969) (refusing to postpone disposition of the case despite pending Supreme Court consideration of the relevant legal issue where the defendant failed to object in the district court).

Feinberg argues that the court's jury instruction regarding "use and carry" was improper in the light of the Supreme Court's narrow definition of "use" in *Bailey*. Feinberg is correct in that the Supreme Court limited "use" to those instances in which the defendant actively employees the destructive device in the commission of the predicate crime. However, the Court did not define "carry." Our court has found the following definition of "carry" sufficient to support a conviction under § 924(c)(1): "to move while supporting: TRANSPORT." *Baker*, 78 F.3d at 1247.

■ In some cases, where the evidence regarding "carrying" or "active employment" was scant, we have reversed convictions obtained under the pre-*Bailey* "use and carry" jury instructions. This is not one of those cases. The evidence in this case demonstrates that, in furtherance of the conspiracy with Feinberg, Mares and Mahn transported pipe bombs. Indeed, Mares was riding in the car holding one of the bombs in his lap when the bomb detonated. If holding a bomb in your lap while in route to blow up your target does not constitute "carrying" the bomb, we cannot imagine what would.

As the government noted in its brief, it was impossible for the jury to have imputed to Feinberg any "use" of the bombs by Mares and Mahn without also having imputed that the bombs were "carried" or transported by Mares and Mahn. Any fact-finder,

looking at these facts, certainly would conclude that the bombs were "carried." The jury instruction in this case does not rise to the level of plain error; the jury's verdict would have been the same under a proper instruction.[5]

Of course the foregoing pertains to the infirmity of Feinberg's argument on the merits. Feinberg's *Bailey* argument suffers from a greater infirmity. At oral argument the government vehemently objected to Feinberg's *Bailey* argument, mentioned for the first time in Feinberg's reply brief. The government argued that Feinberg forfeited his claim to relief under *Bailey* by Feinberg's failure to raise *Bailey* in his appellate brief. We agree.

■ The Supreme Court decided *Bailey* before Feinberg's appellate brief was filed. In this circuit we enforce the command of Federal Rule of Appellate Procedure 28. *See United States v. Hubbard*, 61 F.3d 1261, 1273 (7th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1268, 134 L.Ed.2d 216 (1996); *John Doe v. United States*, 51 F.3d 693, 699 (7th Cir.1995); *United States v. Jones*, 34 F.3d 495, 499 (7th Cir.1994); *Wilson v. Giesen*, 956 F.2d 738, 741 (7th Cir.1992); *United States v. Berkowitz*, 927 F.2d 1376, 1391 (7th Cir.), *cert. denied*, 502 U.S. 845, 112 S.Ct. 141, 116 L.Ed.2d 108 (1991). Rule 28 forces appellants to set forth all of their bases for appeal in their initial brief filed with the court of appeals. Rule 28(a)(6) expressly provides that the appellant's initial brief must contain "the contentions of the appellant on the issues presented, and the reasons therefor, with citations to the authorities, statutes, and parts of the record relied on." Any issues or arguments of which the appellate may wish to avail himself are forfeited unless proffered in the appellate brief. Although an appellant may file a brief in reply to the appellee's brief, the scope of the reply

---

4. Where the government has forfeited plain error review, we have applied a lesser standard. *See United States v. Smith*, 80 F.3d 215, 221 (7th Cir.1996); *United States v. Thomas & Story*, 86 F.3d 647, 651 (7th Cir.1996). In this case the government invoked plain error review both at oral argument and in a supplemental brief filed with the permission of our court.

5. Feinberg also contends that a § 924(c) conviction cannot be obtained by imputing to Feinberg the acts of his coconspirators under *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). Feinberg's argument runs counter to the law of this circuit. *See Thomas & Story*, 86 F.3d at 651.

brief must be limited to addressing the arguments raised by the appellee. The reply brief is not the appropriate vehicle for presenting new arguments or legal theories to the court.

■ In this case *Bailey* was available to Feinberg at the time that he filed his appellate brief. It is true that Feinberg took issue with Count 9 on appeal. He challenged Count 9 under a constructive-amendment theory based on an alleged distinction between extortion and attempted extortion in the indictment. But Feinberg never mentioned *Bailey* or the "use and carry" language in his initial brief. Nor did the government raise the issue in the appellee's brief. Therefore, Feinberg's attempt to raise the issue in his reply brief was improper; Feinberg forfeited his *Bailey* argument.

### IV.

■ Finally, Feinberg challenges the sentence he received for his conviction on Count 10. Count 10 charged Feinberg with attempting to damage by means of an explosive device the building housing one of the Mays' porn shops in violation of 18 U.S.C. § 844(i). Feinberg argues that the district court's failure to consider his life expectancy was an error of law under *United States v. Prevatte*, 66 F.3d 840 (7th Cir.1995) and *United States v. Martin*, 63 F.3d 1422 (7th Cir.1995). As the government notes in its brief, *Prevatte* and *Martin* "interpreted the interplay" of 18 U.S.C. § 844(i) and 18 U.S.C. § 34, as § 34 existed prior to being amended in 1994. Our court concluded that the reference to § 34 in § 844(i) required the district court to consider the life expectancy of the defendant in determining the defendant's sentence in cases where death resulted and the jury did not specifically recommend a life sentence. We need not address Feinberg's argument at length.[6] Reviewing the district court's alleged legal error *de novo*, we conclude that if there was an error, it was surely

harmless. *See Williams v. United States*, 503 U.S. 193, 201–04, 112 S.Ct. 1112, 1120–21, 117 L.Ed.2d 341 (1992). Feinberg would have received the same sentence had he never been charged with Count 10.

The probation officer calculated Feinberg's sentencing range in the pre-sentencing report provided to the district court. Because Feinberg does not challenge that calculation, we will rely on it for our purposes herein. Count One charged Feinberg with conspiracy to commit the extortion of porn retailers in Phoenix, Cleveland, and the Mays in Chicago. Pursuant to Sentencing Guideline § 1B1.2(d), the conspiracy to commit the three extortion offenses was treated, for sentencing purposes, as a conviction for three separate conspiracies. The conspiracy to extort from the Mays was accorded an adjusted offense level of 25. Pursuant to Sentencing Guidelines §§ 1B1.2(d) and 3D1.2, Application Note 4, the conspiracy to extort from the Mays was grouped with Counts Seven, Eight, and Ten because they all involve the same victim and they all are linked by a common scheme or plan. *See United States v. Griffith*, 85 F.3d 284, 288–89 (7th Cir. 1996) (explaining the grouping provisions of the Sentencing Guidelines). The adjusted offense level for the group is the highest adjusted offense level for any object offense in the group. U.S.S.G. § 3D1.3(a). Of the object offense levels in the group, the conspiracy to extort from the Mays and Count 7 carried the highest adjusted offense levels; each received an adjusted offense level of 25. Count 10 received an adjusted offense level of only 19. Therefore, the adjusted offense level for the group was 25. When the adjusted offense level for the group was combined with the adjusted offense levels for the other groups, the applicable guideline range was 121–151 months.

The point is that Count Ten had no effect on the computation of Feinberg's sentence.

---

**6.** Feinberg's brief is ambiguous regarding whether Feinberg intended to object to his sentence for Counts One, Seven, Eight, and Nine based on the *Prevatte/Martin* analysis. To the extent that he does, his argument is misplaced. Count 10 is the only count in Feinberg's indictment which references 18 U.S.C. § 844(i). Title 18 U.S.C.

§ 844(i) is the only statute of which Feinberg was convicted that either references 18 U.S.C. § 34 or subjected Feinberg to a potential life sentence. Therefore, the *Prevatte/Martin* analysis is inapplicable to Feinberg's sentence for the remaining counts.

Therefore, it matters not whether the district court considered Feinberg's age with regard to Count 10. If the court erred in failing to take account of Feinberg's age, the error was harmless.

### Conclusion.

For all of the foregoing reasons, Feinberg's convictions and sentence are

AFFIRMED.