**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Joseph IENCO, Defendant–Appellant.**

No. 95–2790.

United States Court of Appeals,
Seventh Circuit.

Argued June 7, 1996.

Decided Aug. 12, 1996.

Barry Rand Elden, Chief of Appeals, Office of United States Atty., Criminal Appellate Div., Chicago, IL, Deborah Watson, Dept. of Justice, Criminal Div. (argued), Washington, DC, for Plaintiff–Appellee.

Jeffrey N. Cole (argued), Cole & Staes, Chicago, IL, for Defendant–Appellant.

Before POSNER, Chief Judge, and FLAUM and RIPPLE, Circuit Judges.

POSNER, Chief Judge.

A jury convicted Joseph Ienco of a variety of federal crimes growing out of an unsuccessful attempt at extortion. The crimes included conspiracy to commit extortion, 18 U.S.C. § 1951, interstate travel in aid of racketeering, 18 U.S.C. § 1952, and using or carrying firearms during and in relation to a crime of violence, 18 U.S.C. § 924(c)(1). The judge sentenced Ienco to 33 years and 5 months in prison, of which 30 years were due to the fact that one of the firearms was equipped with a silencer. See *id.* The ap-

peal complains about errors committed at the suppression hearing and at the trial.

Jerome Greenberg, a Chicago dealer in clothing "seconds," bought 28,000 pairs of denim shorts that had been made in Tunisia, and resold them. The purchase was arranged in a telephone call from Tunisia to Chicago, and no price was fixed. Some months later Greenberg received a letter from a lawyer in New York demanding $5 a pair for the shorts. He refused, pointing out that he had not agreed to pay so much. He refused again when shortly afterward he received an angry anonymous phone call demanding payment.

At this point Joseph Ienco enters the story. A New Yorker, he was asked, presumably by the seller of the shorts or someone acting for her, to collect the $140,000 supposedly owed her by Greenberg. He enlisted the aid of his friend Gregory Iovine, whose intimidating size (6 foot 5 inches and 285 pounds) made him an ideal extortionist. According to Iovine, who testified for the government at Ienco's trial, Ienco told him that if Greenberg refused to pay the debt they would grab him, shove him into a car, and put a gun equipped with a silencer to his head. The silencer would make them seem professional and their threat to kill him therefore more credible than it would otherwise be.

Ienco and Iovine traveled by train to Chicago. Iovine speculated at the trial that Ienco had chosen that means of transportation because of the absence of metal detectors in train stations. When they got to Chicago they rented a minivan and checked into a hotel. Ienco put the two pistols that he had brought with him from New York in the safe in the hotel room. After some false starts the two men found the building in which Greenberg had his office, an apartment building with some offices in it. They went to the building, entered it without being buzzed in (someone had propped the door open), and barged into Greenberg's office without knocking. Ienco said that he and his pal were there to collect the debt for the shorts that Greenberg had bought. Greenberg suggested they take the matter to court. Ienco replied, "We're the court.

We'll collect it here." Greenberg said, "What, are you here to break legs?" Ienco answered, "We could have done that already." Greenberg told his secretary to call the police, and Ienco and Iovine left; Ienco said they would be back.

Back at the hotel Ienco told Iovine (according to the latter's testimony) that he wanted to go back to Greenberg's office at 5 p.m. and grab Greenberg and put the gun to his head as planned. And, sure enough, late that afternoon the two men drove the van, with the guns in the back of it, to the vicinity of Greenberg's building. They parked, leaving the guns in the van, and entered the building. Greenberg was watching a closed-circuit television monitor showing the lobby area and saw the two men scanning the directory in the outer lobby. He called the police, and he told his nephew, Ross Berman, who was in the office with him, to go downstairs and watch for them. On his way out of the building Berman asked Eleanor Harfmann, who worked in the building's office, on the first floor, to call the police again.

Two officers in a police car arrived within minutes. According to the testimony of one of the officers at the hearing on Ienco's motion to suppress (the other officer did not testify), and of Berman, who also testified at the hearing, Berman told the officers that two men in the lobby were trying to get in without authorization. As Berman was speaking to the officers, Ienco and Iovine emerged from the building and when Berman saw them he ran across the street and hid behind a tree. From this reaction, the officers inferred that they were the men who had tried to enter the building. (Berman himself testified that he pointed and nodded but the officer's testimony does not suggest any such signaling of the extortionists' identity.) One of the officers asked the two men— who were indeed Ienco and Iovine—whether he could ask them a few questions. Ienco and Iovine consented, and the officer asked them what they were doing in the building, how they had gotten there—they said by cab—where they were from, and so on, to all of which they gave innocent-sounding answers. The officer then asked them whether they would mind remaining while he tried to

find out who had called the police. They agreed and he directed them to sit in the back of the police car. They did so, and he shut the door, locking them in (the back doors of the police car had no interior handles). The officer then interviewed Berman and Greenberg. On the basis of what they told him he returned to his car and told Ienco and Iovine that they were under arrest for attempting an improper entry into a building. About a half hour had passed since they had first been placed in the back seat of the police car.

Ienco's version of the arrest was different. He testified at the suppression hearing that he and Iovine had been seized by the police the moment they emerged from the building, with no preliminary questioning.

After the two men were removed from the police car upon its arrival at the police station, and booked, the police, as is routine, searched the back of the car—and found the key to the rented minivan. They went back to Greenberg's building and in a nearby street found the van. The key fit. The police drove the van to the police station and searched it, finding the two pistols, one fitted with a silencer, in the back seat.

At the conclusion of the suppression hearing, the district judge said that he believed the officer's testimony and disbelieved Ienco's, and ruled that the search of the van had not involved any constitutional error. He did not say whether he thought that Ienco and Iovine had consented to remain in the back seat of the police car or had been placed there pursuant to a lawful *Terry* stop. In either event, the subsequent search of the van would have been lawful. By discarding the key, Ienco disclaimed any interest in the van. Cf. *United States v. Duprey*, 895 F.2d 303, 309 (7th Cir.1989). He does not argue that the key merely slipped out of his (or Iovine's) pocket. So it was as if he had said, "We don't know anything about the van and its contents." And that would be abandonment. *Abel v. United States*, 362 U.S. 217, 241, 80 S.Ct. 683, 698, 4 L.Ed.2d 668 (1960); *Bond v. United States*, 77 F.3d 1009, 1013 (7th Cir.1996). But if Ienco's version of the encounter with the police is believed, the search of the van was illegal, because according to him the police arrested him before they had spoken to him or Iovine, or to Greenberg, and thus before they had probable cause to think that Ienco and Iovine had attempted an illegal entry. This conclusion is compelled even if (as we greatly doubt) Ienco's telling the police that he and Iovine had come by cab was an abandonment of the van. That statement was a part not of Ienco's testimony but of the officer's. We are considering what difference it would make to the legality of the search if Ienco rather than the officer were believed.

The reason this is important is that the judge made a serious error at the suppression hearing. Ienco's lawyer, in the company of an investigator whom the lawyer had retained, had interviewed Eleanor Harfmann a week before the hearing. The lawyer told the judge that during the interview she had told him that she had witnessed the encounter between the police and Ienco and Iovine from her office window and that there had been no sign of Berman—that in fact the police had placed the two men in the back seat of the police car as soon as the officers arrived. Had she so testified at the hearing, this would have contradicted the officer's version of the encounter, in which Berman figured prominently and an interval of questioning occurred before the two extortionists were placed in the police car. The day before the suppression hearing, the lawyer discovered that Harfmann was going to testify differently—was going to say that she had been interrupted by a phone call and as a result had missed seeing the early stages of the encounter between the extortionists and the police. The defense lawyer called her as a witness at the suppression hearing and, sure enough, she testified that she had been interrupted, whereupon the lawyer said to her, "isn't it true that you saw the police arrive and as soon as they arrived both men were put inside the police car?" The government objected to the question as leading. The district judge sustained the objection. He considered it improper for the defense counsel to ask a leading question of his own witness without notifying the court, in advance of calling the witness, that he was going to treat her as an adverse witness,

unless he was surprised by the witness's testimony, which he could not have been since he had known the day before what that testimony was going to be.

 Rule 607 of the Federal Rules of Evidence allows the credibility of a witness to be impeached by any party, including the party calling the witness, and the asking of leading questions is a standard technique of impeachment. It is a technique more commonly employed in cross-examination than in direct examination, for the obvious reason that the other side's witnesses are more likely to be adverse than one's own. But if you call an adverse witness you can, in effect, cross-examine him. Rule 607 abolishes the voucher rule and its corollaries, such as having to declare your witness adverse before cross-examining him or to show that his testimony surprised you. The abolition of the rule is not recent, Fed.R.Evid. 607, Notes of Advisory Comm.; *Chambers v. Mississippi,* 410 U.S. 284, 296 n. 9, 93 S.Ct. 1038, 1046 n. 9, 35 L.Ed.2d 297 (1973); *Nelson v. Farrey,* 874 F.2d 1222, 1227 (7th Cir.1989); *United States v. Webster,* 734 F.2d 1191, 1193 (7th Cir.1984); *United States v. Frappier,* 807 F.2d 257, 259 (1st Cir.1986); *United States v. Hogan,* 763 F.2d 697, 702 (5th Cir.1985), and we cannot understand the district judge's attempting to enforce it. The judge compounded the error by striking Harfmann's testimony in its entirety as a sanction for what he erroneously believed to be the lawyer's grievous violation of the rules of evidence. The only violation of the rules of evidence was by the judge.

Although the rules of evidence are designed primarily for the control of jury trials, they serve a valuable function even in nonjury evidentiary hearings by keeping out extraneous matters that would merely protract and confuse the proceeding. But when, as in a suppression hearing, a jury is not involved, there is no reason for the judge to become preoccupied with the niceties of the rules of evidence. The judge in this case spent a good deal of time during the hearing lecturing the lawyers on those niceties. As a result of his preoccupation he fell into error that we cannot, as we usually can, when a violation of the rules of evidence occurs dur-

ing a nonjury proceeding, overlook as harmless.

Ienco and the arresting officer gave irreconcilable versions of the encounter leading up to the arrest. (Iovine did not testify.) If Ienco was believed, the arrest had been made before the officer had probable cause to believe that Ienco had committed a crime—before he had anything more than a hunch that the two men leaving Greenberg's building were the men whom Greenberg had reported to the police—and was therefore unlawful. If the officer was believed, he had had reasonable suspicion, based on Berman's identification of the two men, to hold them for a reasonable period of inquiry necessary for the suspicion either to be dispelled or, as happened, to mature into probable cause for a lawful arrest. In the circumstances, which required the officer to interview Berman and Greenberg in order to have a responsible basis for making the decision whether to arrest Ienco and Iovine, a half hour was not so long a time as to convert the stop into an arrest, which would (or so we may assume on the existing record) have been an unlawful arrest if it had occurred before the officer interviewed Berman and Greenberg. *United States v. DeBerry,* 76 F.3d 884, 885 (7th Cir.1996). If the arrest was legal, so was the search of the van, not only because the van had been abandoned but also because the police were entitled to impound it when they found it (since the renter was in jail) and to conduct an inventory search of it. *Colorado v. Bertine,* 479 U.S. 367, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987). But if the arrest was illegal, evidence obtained by the discovery of the key hidden by the arrested persons in the police car and the ensuing discovery, impoundment, and search of the van would be inadmissible, all that being a fruit of the unlawful arrest. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *United States v. Ingrao,* 897 F.2d 860, 866 (7th Cir.1990).

The government's alternative theory is that if the officer's testimony is believed, the stop was consensual and therefore lawful whether or not there was an articulable suspicion of illegal activity. It strains credulity rather far to suppose that Ienco and Iovine

consented to be locked in a police car for half an hour. There was no explicit consent; and the record is silent on whether they knew that they would be locked in. Even on the officer's own account, the two were directed into the car rather than asked whether they minded being locked in the back seat for an indefinite period. The question of consent is one of fact; and given the many cases in which a finding of consent has been upheld in settings much like that of the present case, e.g., *United States v. Mendenhall*, 446 U.S. 544, 557–58, 100 S.Ct. 1870, 1878–79, 64 L.Ed.2d 497 (1980); *United States v. Nobles*, 69 F.3d 172, 180–81 (7th Cir.1995) (but see *United States v. Ramos*, 20 F.3d 348, 351–52 (8th Cir.1994); *United States v. Jefferson*, 906 F.2d 346, 350 (8th Cir.1990)), though without (at least so far as appears from the opinions) the added wrinkle of the doors to the police car being locked from the outside, we do not hold that a judge who believed the officer's testimony in this case could nevertheless not find consent.

"[W]ho believed the officer's testimony . . ."; it is critical whether Ienco or the officer is believed. Berman's testimony might have been a tiebreaker, but we cannot be sure of this. He might not have been believed. He was not a completely disinterested witness; Ienco had threatened his uncle and (by his own account) terrified him. And his testimony that he had explicitly identified the two extortionists to the police was not supported by the police testimony. Harfmann, had she stuck to her original story, just might have tipped the balance of credibility in favor of Ienco. Ienco's lawyer was entitled to a fair opportunity to use the techniques of cross-examination to try to bring her back to her original story. He might well have failed, but we cannot determine this because his effort was squashed at the threshold. He claimed to have a witness to Harfmann's original story. And he brought out in his questioning of her that although she is no longer employed by the building her son is. Mr. Greenberg, as the owner of a condominium in the building, participates in its governance and so has some potential influence over her son's employment. From this a trier of fact might, though of course would not be required to, infer that she changed her story in order to avoid retaliation against her son.

■ There must be a new suppression hearing. But since the new hearing may end in the same determination as the old—that the search was legal—we must consider the alleged errors committed by the judge at the trial, since if they were prejudicial errors there will have to be a new trial even if the motion to suppress is again denied. Two errors are alleged. Both go to Ienco's conviction of the firearms offense, but that is by far the most serious offense of which he was convicted. First, the judge unaccountably changed his mind on whether to give a *Pinkerton* instruction, an instruction that would make Ienco liable for the substantive crimes committed by his coconspirator, Iovine, in the course of their conspiracy to extort money from Greenberg. *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). During the prosecution's case in chief the judge announced that he would not give a *Pinkerton* instruction, as urged by the prosecution. He did not give an intelligible explanation (maybe the transcript is garbled at this point), and we cannot think of a reason. But there it was, and, relieved, Ienco's counsel, in presenting his defense (mainly through cross-examination of the government's witnesses, including Iovine), tried to show that the gun with the silencer was really Iovine's rather than Ienco's. After most of the examination and cross-examination of the witnesses was complete, the judge changed his mind and said he would give a *Pinkerton* instruction after all; and he did. The consequence was that the defense had been incriminating the defendant in trying to show that the gun was Iovine's, since under *Pinkerton* Ienco was equally responsible for Iovine's use or carriage of a gun, equipped with a silencer, during and in relation to a crime of violence, which a conspiracy to commit extortion is. 18 U.S.C. § 924(c)(3)(B).

■ An about-face of this sort by the judge, which (unintentionally of course) tricks the defendant into helping the prosecutor convict him, is error. *United States v. Mendel*, 746 F.2d 155, 163 (2d Cir.1984); see also *United States v. Gill*, 909 F.2d 274, 279–

81 (7th Cir.1990); *United States v. Baker*, 722 F.2d 343, 346 (7th Cir.1983). And it was prejudicial error here, when it is viewed in conjunction with the other error at trial, the giving of an erroneous instruction regarding the firearm offense. The judge cannot be faulted for giving the instruction. He was following the law of the circuit. But after the instruction was given and Ienco convicted of using or carrying a firearm during and in relation to a crime of violence, the Supreme Court held that "using" requires active employment, such as brandishing or shooting, and not mere possession. *Bailey v. United States*, —— U.S. ——, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995). The pre-*Bailey* instruction that the district judge gave in this case was explicit that the jury could convict if it found that Ienco had "knowingly possessed the firearm during the course of and in relation to the commission of the offense," even if the gun was never displayed or discharged but served merely to "embolden" Ienco.

◾ Since the guns were in the back of the minivan when Ienco and Iovine drove to Greenberg's building on the fatal day, there is no doubt that Ienco knowingly possessed them; so the jury would have had to look no further in order to convict. But the government argues that the evidence that Ienco either used or carried the guns within the meaning of the statute as interpreted by *Bailey* was so overwhelming that the instructional error was "harmless beyond a reasonable doubt." We do not understand why the government thinks this the right standard. Ienco did not object to the instruction at trial, so the proper standard of appellate review is whether the error was plain. *United States v. Feinberg*, 89 F.3d 333, 339–40 (7th Cir. 1996); *United States v. Baker*, 78 F.3d 1241, 1246 (7th Cir.1996); *United States v. Randazzo*, 80 F.3d 623, 631–32 (1st Cir. 1996); *United States v. Workman*, 80 F.3d 688, 696–98 (2d Cir.1996). But by arguing that the proper standard is whether the error was harmless beyond a reasonable doubt, the government has waived any argument that the error merely was not plain. *United States v. Feinberg*, supra, 89 F.3d 333, 340 n. 4; *United States v. Cotnam*, 88 F.3d 487, 499 n. 12 (7th Cir. 1996). And under the higher standard, the government cannot prevail.

There was clearly no use of the guns within the meaning of *Bailey*; this much the government acknowledges. It says that the evidence of carriage was conclusive, but since the evidence of use under the erroneous instruction was also conclusive, there is no basis for confidence that the jury even considered the evidence of carriage; and when there is reason to doubt that the jury even considered the only proper theory under which the defendant can be convicted, the verdict cannot be upheld merely because we are confident that the jury would have convicted had it considered that theory. *Griffin v. United States*, 502 U.S. 46, 59, 112 S.Ct. 466, 474, 116 L.Ed.2d 371 (1991); *United States v. Briscoe*, 65 F.3d 576, 584 n. 9 (7th Cir.1995). That would amount to directing a verdict for the prosecution in a criminal trial, which is never permissible. *Sullivan v. Louisiana*, 508 U.S. 275, 277, 113 S.Ct. 2078, 2080, 124 L.Ed.2d 182 (1993). An error is harmless if it is unlikely to have affected the verdict; that presupposes a verdict; if a defendant were tried for two offenses, and only one was submitted to the jury, his conviction could not be upheld on the ground that if the other one had been submitted the jury would surely have convicted him of it. Here, as in *Griffin*, both offenses (use and carriage) were put to the jury, but we have no reason to suppose that it actually considered the second.

If on remand the motion to suppress is again denied, the judge should reinstate the convictions other than for violating 18 U.S.C. § 924(c)(1). But there must in any event be a new trial on that charge. All the further proceedings in this case will be before a different judge in accordance with 7th Cir. R. 36.

REVERSED AND REMANDED.