In the
United States Court of Appeals
For the Seventh Circuit

No. 99-2480

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

CORNELL R. BYRD,

Defendant-Appellant.

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 99-CR-110-S--John C. Shabaz, Chief Judge.

Argued January 10, 2000--Decided March 31, 2000

Before FLAUM, MANION, and EVANS, Circuit Judges.

EVANS, Circuit Judge.  Cornell Byrd appeals his conviction of assault on and interfering with federal officers, in violation of 18 U.S.C. sec. 111. Byrd represented himself in the trial court. He was convicted and sentenced to 3 years in prison on top of a 10-year term he was already serving.

In 1998 Byrd was a 47-year-old federal prisoner doing time at the Federal Correctional Institution in Oxford, Wisconsin, when his testimony was requested by the defense in a federal trial in Chicago. Because no U.S. marshals were available, Chicago police officer Daniel Brannigan and ATF agent Daniel Young were dispatched to Oxford to bring Byrd to Chicago. This was not a great idea, for Byrd previously had dealings (apparently unpleasant) with the two officers, and he became agitated when he saw that they would be transporting him to Chicago. Byrd, who was shackled and restrained (he was handcuffed, belly-chained, and fitted with leg shackles), was profane in expressing his displeasure as he was placed in the back seat of a car. Brannigan said he leaned over Byrd to fasten the seatbelt, but Byrd moved his knee and elbow, hitting Brannigan in the arm. Brannigan then held Byrd down by putting his arm across his throat and punching him in the belly, at which point, according to Brannigan, Byrd spit on him.

Byrd was charged with assault on Brannigan and interference with both Brannigan and Young.

At trial in the Western District of Wisconsin in Madison, Byrd chose to represent himself. Standby counsel was appointed but Byrd made it very clear that he did not want help, even to the point of only reluctantly taking a pen, legal pad, and typing services from the lawyer.

Prior to trial, Byrd was held in the local Madison jail. Inmates in the jail have no direct access to a law library. So, other than the Federal Rules of Criminal Procedure, the Federal Rules of Evidence, and a pattern jury instruction on self-defense, Byrd did not have legal materials. Following a one-day trial, Byrd was convicted on both counts. He appealed, and, apparently not overwhelmed with his own legal acumen, he asked for the appointment of an attorney to represent him. We honored his request and appointed an attorney to prosecute the appeal./1

Byrd contends he was denied access to legal materials. He says that because he was being held in a county jail he did not have access to a law library, and that deprived him of the ability to adequately represent himself. The short answer to his complaint is that when a person is offered appointed counsel but chooses instead to represent himself, he does not have a right to access to a law library. See United States v. Chapman, 954 F.2d 1352 (7th Cir. 1992). The rule is that he has the right to legal help through appointed counsel, and when he declines that help, other alternative rights, like access to a law library, do not spring up.

But Byrd argues that his is a good case for setting out standards for district courts to employ when defendants, under Faretta v. California, 422 U.S. 806 (1975), insist on representing themselves. He urges us to look at the standards suggested by the American Bar Association and he offers three suggestions as to what a district court should do in a situation such as his. First, the court should attempt to allow a defendant access to a law library. Second, if the facility in which he is incarcerated has no law library, the court should transfer the defendant to a place where he would have daily access to a library. Third, the court should appoint standby counsel, either as ordinary standby counsel or a hybrid form in which counsel acts, in effect, as co-counsel with the defendant. Byrd points to the ABA standard on "standby counsel for pro se defendants" and urges that it be adopted. See ABA Standards of Criminal Justice (2d), Special Functions of the Trial

Judge, Standard 6-3.6 and 6-3.7.

Byrd says his standby counsel was a "potted plant" who did nothing. Counsel did not independently provide any direction or materials, and so Byrd did not know, for example, what a lesser-included offense was and he did not know that, arguably, a misdemeanor under 18 U.S.C. sec. 1501 was appropriate as a lesser-included offense to his charge.

What is clear in his case, however, is that Byrd did not want counsel's help. The problem posed by his insistence on representing himself received a good deal of attention from the magistrate judge handling pretrial matters. It was a major topic at three hearings, during which the judge learned that Byrd had represented himself in other cases and on several habeas petitions. Byrd's rejection of appointed counsel was so strong that at one point the magistrate judge, with good cause, called it an "absolutist view."

This is not an unusual situation; we are aware that managing a criminal trial in which a defendant is representing himself is a chore and that each case is different and may call for different procedures. We do not think that placing restrictions or specific requirements on trial judges in these situations would be a good idea. We prefer to trust the judge's discretion as to how best to handle the situation and how to shape the contours of the obligations, if any, that should be imposed on standby counsel. We think district courts are already well aware of the special problems defendants who represent themselves face, even though many of those problems are self-inflicted. We therefore decline Byrd's request to adopt rules and procedures in this case. And our review of this record fails to disclose any Sixth Amendment reasons for vacating Byrd's convictions.

All of which brings us to another issue. Byrd challenges an evidentiary ruling, and we review that ruling for an abuse of discretion. United States v. Hughes, 970 F.2d 227 (7th Cir. 1992). Erroneous evidentiary rulings in a criminal case constitute reversible error if they affect a party's substantial rights. Fed. R. Crim. P. 52(a); United States v. Peak, 856 F.2d 825 (7th Cir. 1988); see also United States v. Lane, 474 U.S. 438 (1986). Exclusion of evidence which is the only or the primary evidence in support of a defense is deemed to have had a substantial effect on the jury. Peak; United States v. Cerro, 775 F.2d 908 (7th Cir. 1985).

At the final hearing prior to trial, held 3

days before the start of his trial, Byrd requested leave to obtain and present to the jury actual shackles and restraints such as the ones used when he was transported to Chicago. Byrd wanted to show that it would have been very difficult for him to have done what he was accused of doing while restrained as he was. As Byrd said, in setting out what would become the focal issue of the trial:

   Your Honor, the main, one of the main issues in the Indictment is forcibly. I think the relevancy, what's relevant about it is that the chains would show just how much force I could use, if any at all. And the chains, the shackles, the black box, the handcuff, they're standard. U.S. Marshals use them, everybody uses them; they're standard. It's not a--The only thing different you could tell is the serial number.

To which the judge replied, ending with an inversion of an old saw:

   I believe that a description of the handcuffs and the leg irons is reasonable for you to provide, if indeed that is going to be your testimony, without the necessity of having those present because of the fact that I do believe that if indeed they were to be provided it should be those which were used at the time, so I would suggest your description will be, although it will be ten thousand words, I think the ten thousand words is worth more than the attempt to use leg irons and handcuffs which were not those which were used on you.

Byrd contends that the ruling prevented him from presenting his defense with the best relevant evidence.

   That his defense was that the shackles made it difficult, if not impossible, for him to have attacked Brannigan is not open to question. It was, in fact, the only real defense he had. In his closing argument, Byrd told the jury that upon hearing he was to be transported to Chicago he was happy, thinking that he could see his "grandkids." But then Young and Brannigan, whom he describes as two prosecution witnesses in the Chicago trial, arrived, and he said he knew right then that something strange was going to happen. He acknowledged that he was profane, but he said that while shackled he could not have committed the assault.

   The government understood perfectly well what Byrd's defense was and said in closing argument that, even shackled, Byrd had a sufficient range of motion in his arms to allow him to attack Brannigan:

If you've ever seen or if you can ever imagine seeing a line of prisoners being walked along in shackles, though you see that those prisoners are restrained the thought still runs through your mind that you could keep--that you should keep a good distance or some distance away from those prisoners, and that is because in case they lash out you don't want to be within proximity of them. If they have that range of movement, they have that range of movement you don't want to be anywhere where they could reach you, where they could elbow you, where they could do anything to you. If you see a line of prisoners you have a natural tendency to stay some distance away from them so you don't get hurt.

There was much more in this vein, but this is enough for our point. Had the jury seen the shackles, they would not have been urged to "imagine" all sorts of irrelevant and frightening possibilities. Furthermore, it is unlikely that the average juror has even seen a line of shackled prisoners, except in movies like "The Shawshank Redemption" or "Cool Hand Luke." In fact, to avoid prejudicing defendants, district judges take extraordinary efforts to shield jurors from seeing shackled prisoners as they are moved around courthouses. And although unusual sights are not uncommon on State Street in Madison, Wisconsin, it is unlikely that a line of orange-clad, shackled prisoners would be spotted there. Finally, Brannigan is a City of Chicago police officer; how the average juror would feel if he stumbled upon a line of prisoners bears little relationship to how Brannigan should have reacted to transporting one 47-year-old inmate. The admission of actual shackles so the jurors could feel their heft and restraining power would have grounded the case in reality and left less to the imagination.

Before us, the government was at some loss to give a good reason why it objected to the admission of the shackles. Any claim that the actual shackles used on Byrd could not be identified loses force in the face of the basic uniformity in shackles; a set virtually identical to those used on Byrd could have been found without any extraordinary effort. Also, the government acknowledged that there was no indication that Byrd made his request in order to delay his trial. It is unlikely that delay would have been required in any case. Byrd's request was made on Friday, March 19, and trial was not set to begin until Monday, March 22, leaving plenty of time for shackles to be found. If shackles used by the Office of the United States Marshal in Madison--and therefore presumably readily available--were not the same as those

used by Young and Brannigan, either of the officers could have been told to produce the kind which, in fact, were used. Both were already scheduled to be government witnesses at Byrd's trial. Ironically, the perceived inability to obtain shackles forms a striking contrast to the apparent ability, on short notice, to obtain the presence of Byrd for the trial in Chicago. It is hard to imagine an adequate reason for failing to obtain shackles or for their exclusion at trial.

Refusing to let Byrd show the shackles and restraints to the jury was, we believe, an abuse of discretion. The evidence was central to Byrd's defense and so affected his substantial rights. We cannot say that the exclusion of such a fundamental piece of evidence was harmless. Our finding that the exclusion of this evidence was an abuse of discretion is not affected by the fact that Byrd was representing himself. But it is hard to avoid thinking that his self-representation may be the source of the problem. Although we certainly do not think Byrd, without question, would have been acquitted if the jury had seen the shackles, we think his trial was not fair in their absence under the peculiar facts of this case. Cornell Byrd's judgment of conviction, therefore, is REVERSED and the case is REMANDED for a new trial.


/1 On this score, Byrd got lucky. His appointed appellate counsel turned out to be Raymond M. Dall'Osto, a partner in the Milwaukee law firm of Gimbel, Reilly, Guerin & Brown. Mr. Dall'Osto's resume includes a tour of duty as the chief lawyer in the Milwaukee office of the Wisconsin public defender.


MANION, Circuit Judge, dissenting.  While I concur with the panel's decision not to restrict the trial judge's discretion by inventing affirmative duties for standby counsel, I respectfully dissent from the panel's decision to remand this case for a new trial because I think that the exclusion of the shackles was not an abuse of discretion. Byrd bears a "heavy burden" under the abuse of discretion standard, White v. United States, 148 F.3d 787, 791 (7th Cir. 1998),

because he must convince the court that no "reasonable person could agree with the district court." United States v. Hook, 195 F.3d 299, 305 (7th Cir. 1999) (quoting Jackson v. Bunge Corp., 40 F.3d 239, 246 (7th Cir. 1994)). And even if the trial judge erred by excluding the shackles, that error is not ground for a new trial unless it "appears to the court inconsistent with substantial justice," Fed. R. Civ. P. 61, which means that there must be a "significant chance" that the error "affected the outcome of the trial." Hasham v. California State Bd. of Equalization, 200 F.3d 1035, 1048 (7th Cir. 2000).

The court should note the fact that Byrd walked from the jail to the car and entered the car in his shackles, and this fact enabled the jury to reasonably infer (not just imagine) that Byrd had a sufficient range of motion to strike Brannigan with his knee and elbow while Brannigan was leaning over Byrd to fasten his seatbelt. Brannigan was in close proximity and in a vulnerable position, giving Byrd an easy target with his knee and elbow. But even if the shackles prevented Byrd from actually striking the officers, his threatening "display of physical aggression" toward them was sufficient to constitute an assault under 18 U.S.C. sec. 111. United States v. Woody, 55 F.3d 1257, 1266 (7th Cir. 1995). Moreover, Byrd directed more than profanity at the officers, as he actually threatened them with violence, which alone can support a jury's verdict under the statute. See United States v. Mathis, 579 F.2d 415, 418 (7th Cir. 1978). And finally, the jury also heard testimony that Byrd spit in Brannigan's eye, which alone may also constitute a "forcible assault" under the statute. See United States v. Frizzi, 491 F.2d 1231, 1232 (1st Cir. 1974); see also United States v. Masel, 563 F.2d 322, 323-24 (7th Cir. 1977). Since displaying the shackles would not have assisted Byrd's defense in any material way against the evidence that he verbally and physically threatened the officers with violence, and even spit on one of them, there is no "significant chance" that the exclusion of the shackles affected the outcome of the trial. Therefore, since a reasonable person could certainly agree with the district court that the admission of the shackles would have been merely cumulative, not admitting them was not an abuse of discretion. Thus, I would affirm.