In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-2558

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

OVERTIS SYKES,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 07 CR 857—**John F. Grady**, *Judge.*

ARGUED APRIL 6, 2009—DECIDED JULY 19, 2010

Before BAUER, SYKES, and TINDER, *Circuit Judges*.

SYKES, *Circuit Judge.* In a trial he chose not to attend, Overtis Sykes was convicted of four counts of bank robbery in violation of 18 U.S.C. § 2113(a). On appeal he advances three reasons why we should reverse his convictions. First, he claims that the charges against him should have been dismissed with prejudice as a result of a Speedy Trial Act violation. The district court noted the violation but dismissed the charges without preju-

dice, which Sykes contends was an abuse of discretion. Second, Sykes argues he was deprived of his Fifth Amendment right to meaningful access to the courts under *Bounds v. Smith*, 430 U.S. 817 (1977), because for a five-week period before his trial, he was incarcerated in a state prison that had no law library. Third, Sykes challenges the district court's decision to permit jurors to directly question the witnesses.

We affirm. The district court did not abuse its discretion when it dismissed the charges against Sykes without prejudice. The judge thoroughly considered the relevant statutory factors, *see* 18 U.S.C. § 3162(a)(2), and reasonably concluded that on balance, those factors favored dismissal without prejudice. Nor does the record support Sykes's claim that his pretrial detention deprived him of meaningful access to the courts. When he complained to the court, the judge asked whether he wanted a continuance to have more time to prepare a defense, and he said he did not. Finally, although the district court should not have given jurors free rein to directly question the witnesses, Sykes has not established prejudice.

## I.  Background

### A.  The Bank Robberies

Over a 12-day period in June 2006, four banks were robbed on Chicago's North Side. In each robbery a heavy-set African-American man walked into the bank, presented a note to the teller, and left with cash. The note from the

first robbery read: "This is a robbery[.] PUT THE 100s AND 50s on the counter[.] NO FUNNY MONEY[.] I HAVE A GUN[.] **YOU HAVE 15 SECONDS**." The others used similar language. Security cameras captured images of the robber in three of the robberies, and the robber left a drink carton bearing his fingerprints at the scene of the third robbery.

On June 21, 2006, four days after the last robbery, Sykes and his wife, Laura Barkalow,[1] were arrested at a nearby motel. Officers recovered about $500 in cash and a demand note stating: "This is a robbery[.] Put all loose bills on the counter[.] I HAVE A GUN[.] YOU HAVE 15 SECONDS[.]" Sykes's fingerprints were on the notes from the second and third robberies, and the fingerprints on the drink carton left behind at the third robbery matched his. Barkalow's prints were found on the notes from three of the robberies. In addition, Sykes fit the physical description of the robber provided by witnesses, and tellers from the first and fourth robberies identified Sykes in a photo array.

**B. Pretrial Proceedings**

Unfortunately, neither the pretrial proceedings nor the trial ran smoothly. Sykes was charged by criminal complaint in June 2006, and a month later a grand jury returned an indictment charging him with three of the four

---

[1] Barkalow was tried separately. She is mentioned here only insofar as it is relevant to Sykes's appeal.

bank robberies. In early August Sykes was arraigned, entered a plea of not guilty on all counts, and exercised his right of self-representation. *See Faretta v. California*, 422 U.S. 806 (1975). The district court appointed Attorney Robert Korenkiewicz as standby counsel, and because Sykes was making some strange arguments to the court, ordered a psychiatric evaluation to determine if he was competent to stand trial.[2]

In January 2007 the court found Sykes competent to stand trial and scheduled a mid-May trial. In early May 2007, the government requested a continuance pending receipt of fingerprint evidence linking Sykes to the then-uncharged robbery. The government also

---

[2]  At the August 7 status hearing, Sykes told the court:

> If I may, I am a secured party on behalf of Mr. Sykes. . . . I explained to the Court on other occasions that I consider this a dispute over property. I'm a secured property over this entity. So the reason that I am here today is not a general appearance, I am here by special visit to make an offer, to exchange the bond for a guilty plea and use it as my exemption. My exemption has been registered with the Secretary of the Treasury, and that's the reason why I'm here today.

Sykes made similarly bizarre arguments throughout the case. For example, he contended that Title 18 of the United States Code was not properly enacted, that the court had no jurisdiction over him because he was a sovereign, that the government could not prosecute the case because it was not a flesh-and-blood person, and that the *Uniform Commercial Code* somehow relieved him of criminal liability.

moved to sever the trials of Sykes and Barkalow under *Bruton v. United States*, 391 U.S. 123 (1968). On May 30 the government informed the court that it was seeking a superseding indictment for the remaining robbery; the indictment was later returned on July 24, 2007. The following day, Sykes pleaded not guilty to all counts, and the court scheduled trial for November 19, 2007.

On November 14, 2007, Sykes filed a motion to dismiss the superseding indictment for a violation of the Speedy Trial Act, 18 U.S.C. §§ 3161 *et seq.* Sykes pushed for a dismissal with prejudice in light of the length of the delay, which included 224 nonexcludable days.[3] The prosecutor said he had no objection to a dismissal as long as it was without prejudice. On December 20, 2007, the court dismissed the charges without prejudice and ordered Sykes released, which occurred on December 31.

The same day as the dismissal, a grand jury returned a new indictment charging the same four bank robberies. Sykes remained free from December 31 until his arraignment on January 16, 2008, where he again made some bizarre arguments and otherwise disrupted the proceedings. The judge held him in contempt and entered not-guilty pleas on his behalf. At a January 30 status hearing, Sykes asked to be released to prepare for trial. The judge initially granted his request and set trial for March 10. The following day, however, while Sykes was

---

[3] The parties spend considerable time arguing about the proper number of nonexcludable days. We will assume that Sykes's calculation of 224 days is correct.

still in custody, the judge reconsidered this decision and vacated the release order, concluding that Sykes was too risky to be released and that the presence of standby counsel was sufficient to assist Sykes in preparing for trial.

At a status hearing on March 6, four days before the scheduled trial, Sykes moved to dismiss the charges based on alleged violations of his Fifth Amendment right to meaningful access to the courts and his Sixth Amendment right to a speedy trial. Sykes explained that since January 16, 2008, he had been incarcerated at a state prison in Kankakee, Illinois, and that the prison had no law library. Sykes was apparently relying on other inmates to assist him in mailing legal documents and telephoning potential alibi witnesses and his standby counsel. Sykes told the judge that his "numerous" calls to Korenkiewicz "would not go through." Korenkiewicz confirmed that he and Sykes had not spoken during the time Sykes was held in the Kankakee prison. Korenkiewicz explained that he initially thought Sykes was housed at the Metropolitan Correctional Center ("MCC") in Chicago and had delivered trial-preparation material there for Sykes. The MCC did not forward these materials to Sykes at Kankakee or return them to Korenkiewicz.

Sykes told the court he had three alibi witnesses who would help him establish a defense, but that the witnesses had gone missing in light of the long pretrial delay. Korenkiewicz said he had not heard of these potential witnesses until earlier on March 6 and that Sykes

never asked him to try to contact these witnesses. The prosecutor hadn't heard of these witnesses, either, and noted the probable violation of Rule 12.1 of the Federal Rules of Criminal Procedure, which requires the defendant to give notice of alibi witnesses.

The judge asked Sykes if he was requesting a continuance "to permit Mr. Korenkiewicz or a court-appointed investigator to locate and interview these three alibi witnesses you claim to have." Sykes twice answered "no" and said "[t]he damage has already happened." The court responded: "You have answered my question, you are not moving for a continuance, and, therefore, the question of a trial continuance is not before the Court. We will go to trial on Monday morning." The hearing then got out of hand. Sykes alleged that the trial would be "a show trial" and that "[t]here is no defense." He interrupted the judge on several occasions, and the judge again held him in contempt. Sykes vowed he would not attend his trial and that he would not permit Korenkiewicz to attend on his behalf.

## C. Trial

Trial finally commenced on March 10, 2008, and lasted two days. True to his word, Sykes did not attend and forbade Korenkiewicz from attending; they watched through a video/audio monitor but otherwise did not participate in the trial. After the prosecution presented its first witness, the judge sua sponte invited the jury's participation:

> Because Mr. Sykes is not present, I'm going to permit the jury to ask any questions you like of the witnesses as they appear. You don't have to, but if there's any question in your mind about what the witness said or you're confused about anything, go ahead and ask the witness.

Jurors seized this opportunity and posed many questions to the witnesses. Notably, while the first witness was still on the stand, a juror spoke up and asked the judge, "Does [the] defendant not have a defense?" The following exchange ensued:

> THE COURT: That would be up to him.

> JUROR: He has no defense attorney here, though, present?

> THE COURT: I appointed what we call a standby attorney for Mr. Sykes. He demanded the right to represent himself, which he has. Under the Constitution, a person has the right to represent himself. You don't have to have a lawyer.

> Mr. Sykes insisted on representing himself; but as is customary in cases of that kind, I appointed standby counsel for him to consult if he wished to do so. So, we have both Mr. Sykes and standby counsel, and Mr. Sykes has instructed his standby counsel not to appear today or during this trial.

> Mr. Sykes takes the position, for reasons that I won't go into, that this Court has no jurisdiction over him; and this certainly is one reason he's decided to waive his presence.

JUROR: Thank you.

THE COURT: But I do want the jury to know that I've given Mr. Sykes every opportunity to defend, and he has declined to appear in this trial.

The jurors asked the first witness a few more questions, and the judge then added this instruction:

While you're reviewing that, let me remind you—or maybe this is the first time I've said it. Mr. Sykes's absence has nothing to do with whether he's guilty or not. You are to decide whether he's guilty or not based on the evidence that is presented and based on the government's burden to prove beyond a reasonable doubt that Mr. Sykes is guilty, but you should not hold against him the fact that he's not present.

After this unconventional trial, the jury found Sykes guilty on all counts, and the court sentenced him to 240 months' imprisonment.

## II. Discussion

Sykes presents three arguments on appeal. First, he contends that the district court should have dismissed the charges against him with prejudice based on the conceded violation of the Speedy Trial Act. Second, Sykes argues that his pretrial detention in the Kankakee prison violated his Fifth Amendment right to meaningful access to the courts under *Bounds v. Smith*, 430 U.S. 817 (1977). Finally, he challenges the district court's decision to allow jurors to directly question the witnesses.

### A. Speedy Trial Act Violation

The Speedy Trial Act generally requires a federal criminal trial to begin within 70 days from the date the defendant is charged or makes his initial appearance. 18 U.S.C. § 3161(c)(1). Section 3161(h) provides a number of exclusions to the 70-day rule. After 70 nonexcludable days have passed, the Act requires the district court to dismiss the charges "on motion of the defendant." *Id.* § 3162(a)(2). Here, Sykes made the appropriate motion, and the district court dismissed the charges.

The inquiry in this case focuses on whether the district court selected the appropriate remedy for the violation of the Speedy Trial Act. The Speedy Trial Act gives district courts substantial discretion to determine whether to dismiss the indictment with or without prejudice, requiring the court to consider, "among others, each of the following factors: the seriousness of the offense; the facts and circumstances of the case which led to the dismissal; and the impact of a reprosecution on the administration of this chapter and on the administration of justice." *Id.*; *United States v. Taylor*, 487 U.S. 326, 333 (1988). That the court should consider whether the defendant has been prejudiced is implicit in this broadly stated formula. *Taylor*, 487 U.S. at 341 ("[A]lthough the absence of prejudice is not dispositive, in this case it is another consideration in favor of permitting reprosecution."); *id.* at 344 (Scalia, J., concurring in part) ("[T]hat prejudice to the defendant is one of the factors that the phrase 'among others' in § 3162(a)(2) refers to . . . seem[s] to me so utterly clear from the text of the legislation . . . .").

We review the district court's decision to dismiss without prejudice for abuse of discretion, *United States v. Killingsworth*, 507 F.3d 1087, 1090 (7th Cir. 2007), but "undertake more substantive scrutiny to ensure that the judgment is supported in terms of the factors identified in the statute," *Taylor*, 487 U.S. at 337. Here, the judge explained that balancing the statutory factors was "easy to do." The judge noted that the bank-robbery charges against Sykes were "quite serious" and a dismissal with prejudice would result in "a gross miscarriage of justice" given the gravity of the offenses. The judge also said the delay had been "unconscious" on the part of the government and the court, and instead was based almost "entirely [on] the antics of Mr. Sykes, which I now believe to have been totally a product of his imaginative efforts to defend the case based upon notions that he knows are far-fetched and not supported by any rational legal basis." The judge also noted that Sykes did not bring the Speedy Trial Act violation to the court's attention until he filed his motion to dismiss. Finally, regarding prejudice, the judge said that because Sykes was "largely responsible" for most of the continuances, any claim of prejudice was weak; the continuances, the judge remarked, were "granted in some effort to understand what to do with the case that [Sykes] has made into a serious challenge to the Court's ability to do justice."

The court did not abuse its discretion in weighing these factors. The judge accurately characterized bank robbery as "quite serious." *See United States v. Jones*, 213 F.3d 1253, 1257 (10th Cir. 2000) (characterizing armed-bank-robbery and firearm charges as "extremely serious"). The

judge was entitled to consider Sykes's outlandish and disruptive behavior, which posed serious challenges for the court and was in large part responsible for the delay in bringing the case to trial. The court also correctly considered the absence of fault on the part of the government. *See Killingsworth*, 507 F.3d at 1091 ("[T]he absence of bad faith by the government and the lack of prejudice to the defendant nudge this factor in favor of dismissal without prejudice."); *United States v. Arango*, 879 F.2d 1501, 1508 (7th Cir. 1989) (similar). And despite Sykes's argument to the contrary, the court was also justified in observing that Sykes did not bring the delay to the court's attention as the number of nonexcludable days accumulated. *See United States v. Fountain*, 840 F.2d 509, 513 (7th Cir. 1988) ("A defendant who waits passively while the time runs has less claim to dismissal with prejudice than does a defendant who demands, but does not receive, prompt attention.").

There is one aspect of the district court's ruling that requires further discussion, however. The judge commented that our opinion in *Killingsworth* "indicates that unless there is good reason for dismissing with prejudice, the dismissal should be without prejudice." This statement might be read to suggest that the judge thought *Killingsworth* established a presumption in favor of dismissal without prejudice for violations of the Speedy Trial Act. *Killingsworth* did not articulate such a presumption, and indeed, such a holding would be directly contrary to the Supreme Court's opinion in *Taylor*. *See Taylor*, 487 U.S. at 334 ("Congress did not intend any particular type of dismissal to serve as the

presumptive remedy for a Speedy Trial Act violation."); *id.* at 343 n.15 ("[W]e have expressly concluded that there is no presumption in favor of either form of dismissal."). Instead, *Killingsworth* merely concluded that a three-day violation of the Act did not warrant a dismissal with prejudice for charges of possession with intent to distribute over 500 grams of cocaine and possession of a firearm in furtherance of a drug-trafficking crime. Here, the record as a whole makes it clear that the judge ultimately did not apply *Killingsworth* as if it created a presumption in favor of dismissal without prejudice; rather, the judge thoroughly considered and weighed all of the statutory factors, as required by the statute and controlling caselaw.

Sykes claims the court was wrong to hold him responsible for much of the delay. Our review of the record convinces us otherwise. Sykes repeatedly advanced frivolous arguments and made the efficient handling of his case extremely difficult. He also points to the length of the delay, noting that there were 224 nonexcludable days. A lengthy delay is one important factor for the court to consider. But there are no bright-line rules, and a delay of 224 nonexcludable days does not by itself require dismissal with prejudice. *See, e.g.*, *Jones*, 213 F.3d 1253 (affirming district court's dismissal without prejudice in case involving charges of bank robbery and weapons possession where there were 414 nonexcludable days).

Finally, Sykes takes issue with the district court's view that the delay did not imperil his defense. His primary contention on this point is that the delay allowed the

government to bring an additional bank-robbery count in the superseding indictment. This argument makes little sense. The government could have brought that charge at any time within the statute of limitations, even if the district court dismissed the other three counts with prejudice. Sykes's last claim of prejudice is that he remained incarcerated while awaiting trial. But this too is just one factor for the district court to consider. Here, the court was well aware that Sykes remained in pretrial custody and weighed that against the fact that Sykes himself caused a substantial amount of the delay. The district court was well within its discretion to dismiss the charges without prejudice.

## B. Fifth Amendment Right to Meaningful Access to the Courts

Sykes next argues that his pretrial detention in the Kankakee prison violated his Fifth Amendment right to meaningful access to the courts under *Bounds v. Smith*, 430 U.S. 817 (1977). *Bounds* held that the "fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." 430 U.S. at 828. The Court made clear, however, that "while adequate law libraries are one constitutionally acceptable method to assure meaningful access to the courts, our decision here . . . does not foreclose alternative means to achieve that goal." *Id.* at 830.

We have long interpreted *Bounds* to give the government the choice to provide either access to a law library or access to counsel or other appropriate legal assistance. *United States ex rel. George v. Lane*, 718 F.2d 226 (7th Cir. 1983); *accord United States v. Byrd*, 208 F.3d 592, 593-94 (7th Cir. 2000); *United States v. Chapman*, 954 F.2d 1352, 1362 (7th Cir. 1992); *Martin v. Davies*, 917 F.2d 336, 340 (7th Cir. 1990); *United States v. Moya-Gomez*, 860 F.2d 706, 742-43 (7th Cir. 1988); *Howland v. Kilquist*, 833 F.2d 639, 643 (7th Cir. 1987). We have further held that a defendant who declines appointed counsel and instead invokes his constitutional right to self-representation under *Faretta v. California*, 422 U.S. 806 (1975), "does not have a right to access to a law library." *Byrd*, 208 F.3d at 593; *accord Moya-Gomez*, 860 F.2d at 743; *Lane*, 718 F.2d at 227. "The rule is that [the defendant] has the right to legal help through appointed counsel, and when he declines that help, other alternative rights, like access to a law library, do not spring up." *Byrd*, 208 F.3d at 593. Insofar as Sykes contends that access to a law library is *mandated* under *Bounds*, our caselaw squarely forecloses his claim.

Sykes maintains, however, that his right to access the courts was violated because he could not reach his appointed standby counsel during the time he was incarcerated in the Kankakee prison. This argument fails as a matter of fact; the record does not support Sykes's claim that he was deprived of access to the courts. While he was incarcerated at the Kankakee prison, Sykes filed three separate motions to dismiss, each of which quotes relevant legal authorities at length. Sykes admitted that he and the other prisoners who were assisting him

called his claimed alibi witnesses but that *the witnesses* would not answer the calls. He claimed that he called his standby counsel "on numerous occasions" but for some unexplained reason, the calls "would not go through." This five-week inability to reach stand-by counsel is mitigated by the fact that he had access to Korenkiewicz during the first 18 months of his incarceration.

Moreover, when Sykes complained to the court about his inability to reach either his standby counsel or his alibi witnesses, the judge asked him whether he wanted a continuance to allow counsel or a court-appointed investigator to track down these witnesses. Sykes twice answered "no," insisting that "[t]he damage has already happened." Sykes left the district court with little choice but to proceed, having expressly rejected the only obvious cure for any possible *Bounds* violation. Under the circumstances here, Sykes was not deprived of his constitutional right to access the courts.

## C.  Jury Questioning

Finally, Sykes contends that the district court's decision to allow jurors to directly question the witnesses warrants reversal. Because Sykes did not object to this practice at trial—indeed, because he did not even attend his trial—we review his claim for plain error. *See* FED. R. CRIM. P. 52(b); *United States v. Feinberg*, 89 F.3d 333, 336 (7th Cir. 1996). Under the plain-error standard, Sykes must establish that the court plainly erred and that the error affected his substantial rights. *United States v. Olano*, 507

U.S. 725, 732-35 (1993). An error is "plain" when it is "'clear' or, equivalently, 'obvious.'" *Id.* at 734. An error affects substantial rights when it "affected the outcome of the district court proceedings." *Id.*; *accord United States v. Dominguez Benitez*, 542 U.S. 74, 83 (2004); *Feinberg*, 89 F.3d at 336 ("Feinberg must show that but for the jurors' questions, the outcome of the trial probably would have been different."). Even if Sykes makes these showings, the decision to remedy the error is discretionary, and we "should not exercise that discretion unless the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *Olano*, 507 U.S. at 732 (alteration in original) (quoting *United States v. Atkinson*, 297 U.S. 157, 160 (1936)).

We first addressed the practice of juror questioning of witnesses in *United States v. Feinberg*. We held there that the district court may, in its discretion, allow jurors to propose questions to be put to the witnesses. 89 F.3d at 337. We noted that the practice could be beneficial in some contexts, "such as conspiracy or antitrust cases, in which the facts are so complicated that jurors should be allowed to ask questions in order to perform their duties as fact-finders." 89 F.3d at 337. We cautioned, however, that the practice is "fraught with risks." *Id.* at 336. We therefore instructed district courts to

> take prophylactic measures in an attempt to prevent the practice from harming either party. For example, common sense dictates that the questions should be proffered in writing to the district court judge. By reducing the questions to writing, a court eliminates

the possibility that a witness will answer a question prematurely. Written questions also guard against juror commentary that suggests or precipitates premature deliberation.

*Id.* at 337 (internal citation omitted).

We recently revisited the issue of juror questioning in *SEC v. Koenig*, 557 F.3d 736 (7th Cir. 2009), and took a far more approving view of the practice, explaining that the American Bar Association recommended it and recent research on juror questioning had established its benefits. *Id.* at 741. In particular, we noted our own circuit's participation in the ABA's American Jury Project and observed that the "judges, the lawyers for the winning side, and, tellingly, the lawyers for the losing side, all concluded (by substantial margins) that when jurors were allowed to ask questions, their attention improved, with benefits for the overall quality of adjudication." *Id.* Nevertheless, we noted the Jury Project's "proviso that jurors should submit their questions to the judge, who will edit them and pose appropriate, non-argumentative queries." *Id.*

Here, however, the judge did not require jurors to reduce their questions to writing and submit them to the court, which would have allowed the judge to "edit them and pose appropriate, non-argumentative queries," and otherwise filter prejudicial comments. *See also United States v. Rawlings*, 522 F.3d 403, 408 (D.C. Cir. 2008) (listing other sensible prophylactic procedures). Instead, the court allowed—and indeed encouraged—the jurors to interrupt the witnesses and ask questions at will. This

approach significantly increases the risk of prejudice. In light of our statements in *Feinberg* and *Koenig* regarding the need for procedural safeguards, we conclude that the district court erred in allowing the jurors free rein to question the witnesses.

For us to reverse, however, Sykes must establish that jurors asked improper questions or that their questions precipitated some other impropriety in the trial, and that the improper questions affected the jury's verdict. Sykes cannot establish either. Sykes points to the juror's question *to the judge* about his absence from the courtroom and argues that this caused the judge to cast him in a poor light and "disparage[] . . . the merits of the defense case." We disagree. The court's answer to the juror's question was entirely appropriate. The judge correctly explained that Sykes was not present because he invoked his constitutionally protected right of self-representation and then chose not to attend his trial. The judge also explained that Sykes had standby counsel and had instructed his lawyer not to attend the trial. Lest there be any confusion about any inferences from Sykes's absence, the judge quickly added that the jury was not to hold Sykes's absence against him and that it must determine Sykes's guilt beyond a reasonable doubt based only on the evidence before it. To the extent the court's comment cast Sykes in a poor light (and we do not think it did), the court corrected any possible improper impression almost immediately with this remedial instruction to the jury. *See United States v. Curry*, 538 F.3d 718, 728 (7th Cir. 2008) ("This court repeatedly has held that jurors are presumed to follow limiting and curative

instructions unless the matter improperly before them is so powerfully incriminating that they cannot reasonably be expected to put it out of their minds." (internal quotation marks omitted)).

Nor can Sykes show that the jurors' questions likely changed the outcome of this case. *See Dominguez Benitez*, 542 U.S. at 83. He argues that the government might not have sustained its burden of proving identity, but the uncontradicted evidence is overwhelmingly against him. *Cf. United States v. Cotton*, 535 U.S. 625, 632-34 (2002) (exercising discretion not to reverse a plain error because evidence related to error was "overwhelming" and "essentially uncontradicted"); *Johnson v. United States*, 520 U.S. 461 (1997) (same). Not only did the prosecution present substantial fingerprint evidence connecting Sykes to the robberies, but it also elicited testimony that eyewitnesses identified Sykes from a photo array and that Sykes and Barkalow were found in possession of $500 in cash and a substantially similar demand note as the ones used during the robberies. Finally, still images from security-camera footage showed Sykes in the banks, and the absent Sykes offered the jury absolutely no defense that would call his guilt into question. Thus, although the court should not have allowed jurors to directly question the witnesses, there is no reason to question the ultimate outcome of his trial.

AFFIRMED.